UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JERRY WRIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-01626-RLY-TAB |
| | ) | |
| LIBERTY MUTUAL | ) | |
| INSURANCE CO. | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

In October 2004, Plaintiff, Jerry Wright ("Wright") was hired by Defendant Liberty Mutual Insurance Co. ("Liberty Mutual") as a Senior Application Engineer. He was proficient in mainframe programming, and in order to expand his skill set in mid-range programming, Wright sought a transfer within Liberty Mutual's team from his role on the Claims team to a new role on the Data Management Systems ("DMS") team.  His supervisors were very aware of his limited knowledge of mid-range programming, but they accepted his transfer anyway.

When Wright began on the DMS team, he continued to be given programming work in the mainframe and was not able to expand his mid-range skills.  Wright received a performance review from his supervisor, Martin Van Tiem, in which Van Tiem urged Wright be more forceful with the team regarding his efforts to expand his experience and skill set into midrange.  However, Van

1

Tiem offered no more guidance to Wright and continued to give him primarily mainframe programming work.  Despite this, Wright took training sessions, including taking over 200 hours of training in 2007.

In 2008, Wright got the opportunity to work on his first significant mid-range project.  However, Wright was required to work with another employee, Bryan Harrison, who had issues with Wright.  Many others who worked with Harrison had issues with him as well.   Wright did as he was required and worked with Harrison out of necessity, but the animosity between the two grew and Harrison initiated a loud confrontation with Wright which eventually led to Harrison going to HR and informing them, falsely, that Wright had carried a gun to work.  Because of this, Wright expressed his distrust of Harrison to his supervisor, Gene James ("James") Instead, Wright was disciplined for his dealings with Harrison.

In 2009, the DMS team was managed by Dina Young Rogiers ("Rogiers") [1]. Immediately after taking over, Rogiers discussed with Wright a mid-range assignment he was given in which she accused him of ineffectively managing the project.  Wright explained that he was led to believe that he would have a mentor in Shad Schultz ("Schultz") to guide him, but Schultz, another Senior Software Developer, was just as unfamiliar with the assignment.  Subsequently, Rogiers found fault with many of Wright's mid-range projects and eventually, she placed him on a forty-five (45) day written warning for failing to meet performance expectations.  Wright presented Rogiers with reasonable explanations for each

---

[1] Plaintiff understands that since his employment, Dina Young now goes by Dina Rogiers.  For purposes of consistency, Plaintiff will refer to her as Dina Rogiers.

alleged deficiency.  Wright was given tasks which were over his skill level – a skill level that the DMS team supervisors were acutely aware of when they hired Wright. Additionally, Wright dealt with misdirection, misinformation, and design changes from Schultz and Lam Nguyen ("Nguyen"), both of whom were younger than Wright.  Despite these reasonable explanations, Rogiers refused to consider the extenuating circumstances.  No one else, other than David Meyer, another individual over the age of forty, was disciplined for their inability to complete projects ridden with unforeseen extenuating circumstances.

On November 13, 2009, Rogiers extended Wright's probationary period for an additional thirty (30) days.  Wright then suffered through more misdirection on two projects that caused him to miss the December release of the Blank ID Card ticket project and complete only portions of the Services 2 web services schema changes. For each, Wright had to pull the tickets and rework the project.  Having tickets pulled from releases was fairly common in Wright's line of work, and around the same time, co-employees Will Overman ("Overman") and Matt Therault ("Therault") also had tickets pulled.  Both Overman and Therault were younger than Wright. Overman had eleven tickets pulled, and Therault had three.  Yet, these employees, who both had similar mid-range programming skills and both reported to Rogiers were not disciplined for having their tickets pulled.  For his missed deadlines and pulled tickets, Wright was terminated on December 14, 2009.

As discussed herein, there is evidence that Wright was treated less favorably than his younger, similarly situated employees.  Also, there is evidence to show that

Liberty Mutual's proffered reason for Wright's termination is pretext and a reasonable jury could certainly find that the motivating reason for Wright's termination was his age. As such, Liberty Mutual's Motion for Summary Judgment should be denied.

## II.    STATEMENT OF MATERIAL FACTS IN DISPUTE

### A.    Plaintiff's Response to Defendant's "Statement of Material Facts Not in Dispute"

Plaintiff specifically disputes the following facts as asserted by Defendant in its Motion for Summary Judgment. For ease of reference, Wright repeats the facts asserted by Defendant in italics with his response immediately following.

1. *Plaintiff's role on the data management systems (DMS) team required programming skills in both mid-range and mainframe programming. (Tab A, ¶ 7.)*

<u>DISPUTED</u>:   Wright testified that when he was transferred to the data management systems (DMS) team, Defendants were aware of his limited knowledge of mid-range programming and still accepted his transfer. [**Plaintiff's Exhibit A - Wright Dep. at 189**].

Wright stated that he transferred to DMS to "get fundamental basic experience with the Java midrange environment" and to bring his skill level up on the midrange side to where it was on the mainframe side. [Wright Dep. at 189].

2.    *Plaintiff did not have the requisite skills to perform the duties of the Senior Software Developer position. (Tab B, pp. 178, 188, 189, 205.)*

CLARIFICATION/DISPUTED:  Wright testified that he was very open about his midrange  skill set when he transferred positions.  [Wright Dep. at 189].  Wright reiterated this to Gene James and Dina Rogiers when each took over the DMS team.  **[Plaintiff's Exhibit B - Wright Declaration ¶ 2]** Wright also testified that in one project, he could not perform at an SSD level in *this technology yet* (emphasis added). [Wright Dep. at 205].

3.    *Plaintiff's documented weaknesses centered in large part on his ability to complete assignments in a timely manner. (Tab A, ¶21). This included failing to escalate problems to management in a timely fashion and failing to recommend solutions to identified problems, thereby missing deadlines and increasing budgetary costs. (Tab A, ¶ 21.)*

DISPUTED:  Wright did not meet the objectives of many projects due to extenuating circumstances which Dina Rogiers refused to listen to.  [Wright Dep. at 124].

4.    *Plaintiff testified in his deposition that he did not necessarily agree that he had failed to meet expectations in each of the categories, but entered "DNM" because he "just wanted to get the review over with and get past it" and he "just didn't take the review very seriously." (Tab B, p. 164.)*

CLARIFICATION:  Plaintiff testified that he entered "DNM" in each category because "that was simply an effort on my part to avoid confrontation with Dina [Rogiers] to get into arguments about what [he] did or didn't do. [He] thought it was the path of least resistance to simply agree with whatever she said and move on to

try to get past that." [Wright Dep. at 164]. Wright further stated that he did not take the review seriously because, "there was -- it felt like there was so many nebulous and arbitrary goals that were thrown out there that made it difficult to really ascertain specifically what it was you were supposed to do to achieve a goal. And then this was in combination with the projects and tasks that I had been assigned that -- for which I had to pull tickets out because of all the various mitigating circumstances that appeared to carry no weight with [Dina]." [Wright Dep. at 164-165].

5. *However, when asked if there were items listed on the 2009 mid-year on which he did, in fact, fail to meet Liberty Mutual's expectations, Plaintiff identified six assignments listed in which he failed to meet expectations; specifically, Ticket CQ 7261, CQ 6864, Ticket CQ 7128, 6-1 upgrade, Go America Retirement project and EJB project. (Tab B, pp. 165-183.) Plaintiff claims there were extenuating circumstances to explain these failures, but concedes he failed to meet expectations on these assignments. (Tab B, pp. 167-83.)*

CLARIFICATION:   Wright did not meet expectations on the referenced projects because of extenuating circumstances.  Specifically, for each project:

a.    Ticket CQ 7261 – Wright testified that this was a project with significant mitigating circumstances. [Wright Dep. at 166]. The project had an estimated completion time of 40 hours, which was given by Lam Nguyen, but this estimate was not valid. [Wright Dep. at 201]. Wright spent 106 hours on the project. [Id.] However, Nguyen based his estimate on "on conditions that he

thought were true within the particular web service" that Wright was working on. [Id.]  When these conditions turned out not to be true, the estimate was no longer valid and the whole project was thrown off. [Id. at 201].  Wright was also assigned a project to add logging for Ticket 7261.   [Wright Declaration ¶ 11]. Wright was directed to make a design change because Nguyen's first design was not favorable. This design was changed again and again.  By September 2009, the project had gone through five design changes and Wright could not meet deadlines with a design constantly in flux. [Id.] In September 2009, Wright invited Rogiers to attend a meeting where the multiple logging designs were discussed so that she could see first-hand the discussion of the tried-and-rejected designs and how a missed deadline in this case was not his fault. [Id.]  Rogiers attended the meeting and witnessed the discussion and review of the various design efforts proposed by Nguyen and Schultz, but she still rejected Wright's explanation. [Id.]

b.   Ticket CQ 6864 – Wright testified that the tester being used did not have the expertise to test the software that needed to be done. Wright also testified that he finished his portion of the project, but forgot to pass it along to the next team.  Once he realized his error, he passed it along to the next team, but the team was not ready and had system problems, which is why the project was not completed on time.  [Wright Dep. at 168, 206].

c.   Ticket CQ 7128 – Wright testified that the project had a new tester who he did not believe was qualified. Because of this, there was nothing for the tester to test because he lacked the required skills.  Wright informed Rogiers of this

7

concern. [Wright Dep. at 168-169.] Wright also explained that in order to complete the project, he needed access to the new server. [Wright Dep. at 172]. Schultz directed the team to request access to the new server, and Wright did so immediately. [Id.] Unbeknownst to him, in the process, he lost access to the old server, which he needed for the migration project. [Id.] Nguyen, who had not accessed the new server yet, completed the migration. [Id.]

      d.    6-1 upgrade - Rogiers accused Wright of ineffectively managing the assignment. [Def's Brief at 7-8]. Wright explained that he was led to believe that he would have Shad Schultz as his mentor to go to on the project. [Wright Dep. at 185]. Wright told Rogiers that he did not understand why he had been assigned to the project when Schultz, an employee with more experience in the area, also floundered and stumbled around on the project when Wright sought his help. [Wright Dep. at 185].

      e.    Go America Retirement project – Wright testified that he did the portions assigned to him by Schultz and Nguyen. [Wright Dep. at 177] One task assigned by Schultz was not feasible. [Id.] Another task assigned by Nguyen, Wright completed, but Nguyen wanted it done in a specific way so he redid the task. [Id.] Additionally, Wright completed nearly all the administrative work on the project; the coding work was given by Schultz to Brian Harrison to complete because Schultz felt more comfortable with Harrison doing the code work. [Id. at 190-191].

6.   *On the project identified by Ticket 7261, the time estimated for project completion was 40 hours, but Plaintiff spent 106 hours on the project at the time of the memorandum and missed the project testing deadline. (Tab A, ¶ 49; Tab L.) Rather than accept responsibility, Plaintiff said he missed the testing deadline because of the incompetence of the testing employee. (Tab A, ¶ 50.) In reality, Plaintiff had not given anything to the employee to test. (Tab A, ¶ 50; Tab L.) On the same project, Plaintiff told Ms. Rogiers that he would miss the scheduled release date because he had identified potential testing issues. (Tab A, ¶ 51.) However, Plaintiff had no plan in place to address the potential issues he identified. (Tab A, ¶ 51.)*

DISPUTED:  See Response to Disputed Fact 5(a).

7.   *The Go America Retirement project was scheduled to be completed and released for use on June 13, 2009. (Tab A ¶ 37.) On May 26, 2009, Plaintiff informed Ms. Rogiers he had, in his own words, "done nothing on the project" other than administrative work. (Tab A, ¶ 37.)*

CLARIFICATION:  By May 26, 2009, Wright had completed the administrative work on the project. [Wright Dep. at 190].  At this time, Wright was led to believe by Schultz that at that time, there was no coding work that needed to be done. [Wright Dep. at 192-193]. When it was discovered that the code needed to be changed, Schultz gave the coding work in the project to Bryan Harrison because he was more comfortable with Harrison completing the work. [Wright Dep. at 191].

Wright believed the coding work was within his skill range, but Schultz took it from him. [Wright Dep. at 190].

8. *Following the November 13, 2009, extension of Plaintiff's probationary period, Plaintiff continued to fall short of expectations for a Senior Software Developer. (Tab A, ¶ 57.) During this period, Plaintiff missed the release date on a project and only completed approximately half of the work assigned on another projected before the scheduled release date.  (Tab A, ¶ 58.)*

DISPUTED:   Each of the projects involved mitigating circumstances, including misdirection from Schultz on the web services schema project. [Wright Dep. at 10-11].  This misdirection caused Wright to have a ticket pulled and resulted in a lot of unnecessary work and re-work which caused the deadline to be missed. [Id.; Wright Declaration ¶ 16].  On the second referenced project, Wright was unable to adequately test changes because of a web certificate problem. [Wright Declaration ¶ 15].  Wright emailed Schultz on November 20, who told him that he would help with the problem, but Schultz left for vacation without informing me. [Id.] Wright sought assistance from other employees, and learned from Curt Gleim and Nguyen that many had struggled with the issue and gave up on it. [Id.]  Wright was able to find a solution, but it was after the cutoff date. [Id.]

9. *Plaintiff's duties were much different than those of Mr. Therault and Mr. Overman and he was expected to perform at a much higher level. (Tab A, ¶ 76.)*

DISPUTED:  Plaintiff believed Overman and Therault's duties, in the midrange environment, to be similar to his own. [Wright Declaration ¶ 18].

### III.    Plaintiff's Statement of Additional Material Facts

1. Wright was hired by Liberty Mutual on October 11, 2004.  Wright was a member of the Claims application support team as a Senior Software Engineer. [Wright Declaration ¶ 1; Wright Dep. at 88]  Because of his background and experience (mainframe COBOL/DB2/CICS/VSAM), he was immediately assigned a critical support role for a very unstable mainframe application. [Wright Declaration ¶ 1].

2. Around May 2006, Wright transferred to the Document Management and Publishing team in an effort to gain exposure to newer technology – java written applications and web services. [Wright Dep. at 89]. Wright was hired by Marvin Van Tiem. [Wright Dep. at 90]

3. In spite of Van Tiem's assurances to the contrary, Wright was continually relegated to mainframe-specific assignments during 2006, similar in nature to what he had done previously on the Claims team, and gained little-to-no new experience or skills in the areas he was led to believe he'd be working. [Wright Declaration ¶ 3].

4. Around 2006 year-end, Wright received his 2006 performance review from Van Tiem. [Wright Dep. at 129; Defendant's Exhibit Tab F].  Van Tiem recommended that Wright be more forceful with the team regarding his efforts to expand his experience and skill set into java mid-range, and Van Tiem indicated (in spite of initial assurances, when Wright interviewed, to

the contrary), there was little more he could do to help. [Wright Declaration ¶ 4].

5. Wright disagreed with parts of his performance review that he should be more proactive in getting help from others because, at least in some instances, he was the person with the most knowledge on the team, and it would not be beneficial to seek help from another team member. [Wright Dep. at 138-139].

6. In 2007, except for some trivial and very infrequent assignments, nearly all of Wright's work continued to be mainframe focused. [Wright Declaration ¶ 5]. Despite this, Wright continued to take training courses and engaged in over 200 hours of training.  Wright also completed every MindLeaders Java foundation class (14) offered to try to improve his Java skills in anticipation of assigned Java project work. [Wright Dep. at 143; Defendant's Exhibit Tab G]

7. In his 2007 review, Gene James noted that "Jerry has the technical knowledge and skills to be successful on the mainframe.  He is learning the mid-range environment and still needs to come up to speed, which he personally acknowledges." [Defendant's Brief p. 6; Defendant's Exhibit Tab G].  Wright, Van Tiem, and James had discussions on his expanding his midrange skills, and it was Wright who was pushing for the opportunity to work more in the midrange environment. [Wright Dep. at 147-148].

8. Additionally, Wright's 2007 review indicated "Jerry seems to have a fundamental distrust of the organization and had a very strained relationship with his last manager." [Wright Dep. at 151; Defendant's Tab G]. Wright explained that this had to do with Van Tiem, who he believed did things that were destructive in terms of trust and the team dynamic like making derogatory comments about the team and falsely attributing them to other members. [Wright Dep. at 152]. Wright felt like he could not talk to Van Tiem about problems of issues that needed attention due to his attitude. [Id.]

9. In 2008, Wright got his first opportunity to perform significant work in the midrange environment on the Websphere Application Server upgrade project. [Wright Declaration ¶ 6].

10. In his 2008 review, James noted that "Jerry, on several occasions, has refused to work with one individual on the team. This is after he has been told that is unacceptable. On a small team it is not possible to totally avoid working with other team members. He has even submitted a vendor ticket rather than talking to the individual." [Def's Exhibit H; Wright Dep. at 158]. Wright disagreed strongly with James' assessment. [Wright Declaration ¶ 7]. This had to do with employee Bryan Harrison. [Wright Dep. at 158]. In August 2008, Harrison initiated a loud confrontation with Wright that was witnessed by several other team members. Harrison went to HR, complaining that Wright was disrespectful to him, and then followed that up

13

a day later with an 'anonymous' conversation with HR in which he falsely told HR that Wright carried a gun to work. [Wright Declaration ¶ 7].

11. Wright explained that he did not trust Harrison and he expressed extreme discomfort and reluctance to James with regards to working with Harrison. [Wright Dep. at 158]. However, he never refused to work with Harrison. [Id.] He only worked with Harrison as need be, but never refused to do so. [Id.] Wright also never submitted a vendor ticket rather than talking to Harrison. [Wright Dep. at 159]. Rather, Wright believed he asked Harrison about the issue, Harrison did not know the answer, and then Wright submitted the vendor ticket. [Wright Dep. at 159].

12. Other employees also had problems with Harrison, but no one else was disciplined for their dealings with Harrison. [Wright Dep. at 161; **Plaintiff's Exhibit C –Defendant's Interrogatory Response No. 12**]

13. In 2009, Dina Rogiers became manager of the DMS Team. In January 2009, Rogiers discussed with Wright an assignment he was given - a software upgrade known as VIS WAS version 6.1. [Wright Dep. at 185]. Rogiers accused Wright of ineffectively managing the assignment. [Def's Brief at 7-8]. Wright explained that he was led to believe that he would have Shad Schultz as his mentor to go to on the project. [Wright Dep. at 185]. Wright told Rogiers that he did not understand why he had been assigned to the project when Schultz, an employee with more experience in the area, also floundered and stumbled around on the project. [Wright Dep. at 185].

14. In 2009, Wright attended a webservices training session. [Wright Dep. at 49]. In the middle of the session, Wright was pulled out by Schultz who gave Wright another assignment to complete instead of the training he needed. [Id. at 51].

15. On March 31, 2009, Wright was assigned as the Tech Lead to the Go America Retirement project to transition data from one platform to another. [Wright Dep. at 191]. He expressed concern to Rogiers that a Tech Lead role on a java web services project was far beyond his experience and skill level at that point. [Wright Declaration ¶ 8].

16. Despite Rogier's contention that as of May 26, 2009, Wright had "done nothing on the project," Wright had completed the administrative work. [Wright Dep. at 190]. At this time, Wright was led to believe by Schultz that there was no coding work that needed to be done. [Wright Dep. at 192-193]. When it was discovered that the code needed to be changed, Schultz gave the coding work in the project to Harrison because he was more comfortable with Harrison completing the work. [Wright Dep. at 191]. Wright believed the coding work was within his skill range, but Schultz took the work from him. [Wright Dep. at 190].

17. On June 12, 2009, Wright informed Rogiers that the Go America Retirement project lacked a verifiable audit trail – that there was no balancing in place. [Wright Dep. at 193]. Early in the project, in a meeting, Wright suggested that there needed to be end-to-end auditability on the data that was flowing

through this application. [Wright Dep. at 194]. Wright believed this balancing was being done. [Id. at 195].

18. Nguyen informed Wright that the project was ready to test. [Wright Dep. at 195; Wright Declaration ¶ 10] Wright searched for the audit trail to test, but could not find it.  He believed he could not find it because he was overlooking it and he continued to search.  [Id.] When Nguyen returned from vacation, Wright discovered that the audit was never done. [Wright Declaration ¶ 10].

19. On June 24, 2009, Wright was given a 45-day written warning by Rogiers and James for "…performance failing to meet expectations…" that retroactively documented an alleged pattern of failure, largely by selecting quotes and events out of context. [Wright Declaration ¶ 11].

20. Following the warning, Rogiers met with Wright regularly to discuss his progress. [Wright Dep. at 197].

21. Wright's lack of training and experience with the ClearCase software package – a tool used frequently in the midrange environment – contributed to many of the problems he faced on projects in the mid-range environment. In his meetings with Rogiers, he pointed out repeatedly the problems he was having with ClearCase. [Wright Declaration ¶ 13].  Wright repeatedly asked for training but was denied. [Id.]

22. On October 16, 2009, Wright met with Rogiers to discuss his progress. [Wright Declaration ¶ 14].  Wright's logging changes had to be backed out because Nguyen had migrated source code with known problems into the

production environment, which caused problems in production. [Id.]  Nguyen was never disciplined for this issue. [Defendant's Interrogatory Response No. 12].

23. On November 13, 2009, Wright was given written notice of a 30-day probation extension. [Wright Dep. at 209; Defendant's Exhibit Tab M].  This extension was for tickets being pulled from the September release and for a test environment, UA VIS, being down due to a deployment problem. [Wright Dep. at 209-210; Wright Declaration ¶ 15].  Wright stated that the UA VIS was a test region and crashed often. [Wright Dep. at 209].  There was also no way to tell if it was him who caused the region to crash. [Id.]  Wright pointed out to Rogiers that nobody else had ever been disciplined for a test region being down and that everybody knocked down a test region from time to time. [Wright Declaration ¶ 15; Defendant's Interrogatory Response No. 12].

24. Wright was also disciplined for having tickets pulled.  No one other than Dave Meyers, who is also overly forty (40) years old, was disciplined for having tickets pulled. [Defendant's Interrogatory Response No. 12; **Plaintiff's Exhibit D – Excerpt from Personnel File of David Meyer**].

25. In late November, Wright ran into testing problems for the December release of the Blank ID Card Ticket (CQ 7479).  [Wright Declaration ¶ 16].  Wright was unable to adequately test changes because of a web certificate problem. [Id.]  Wright emailed Schultz on November 20, who told Wright he

would help with the problem, but he left for vacation without informing Wright. [Id.]  Wright sought assistance from other employees, and learned from Curt Gleim and Nguyen that many had struggled with the issue and gave up on it. [Id.]  Once Wright found a solution, Rogiers implied in her meeting with Wright on December 8, 2009, that he did not try hard enough on the problem and there had to be another option than the one Wright chose. [Id.]  Wright's ticket was pulled for this project.  [Defendant's Exhibit Tab N].

26.  In another project that Wright worked on – CQ 7836, the Services 2 web services schema changes – Schultz had written the ticket instructions poorly. [Wright Declaration ¶ 17] Despite his ticket, Schultz only needed two webservices changed instead of all eleven.  [Id.] Regardless, Schultz and Nguyen still had the ticket pulled, and Wright completed only half the work by the release date. [Id.] Schultz was not disciplined for his role in this project.  [Defendant's Interrogatory Response No. 12].

27. On December 14, 2009, Defendant terminated Wright for tickets pulled from the December release. [Wright Dep. at 247; Wright Declaration ¶ 18].

28.  Shad Schultz and Lam Nguyen are both younger than Wright and are under the age of forty (40).  [Wright Declaration ¶ 21].

29. Will Overman and Matt Therault were other individuals on the team with a similar level of experience and background in that Java midrange area that were also had tickets pulled from the releases for work that was not done.

[Wright Dep. at 124].   These individuals were not disciplined for having tickets pulled. [Defendant's Interrogatory Response No. 12].

30. Wright did not know Overman or Therault's actual job title but believed each to have the same title – software developer. [Wright Dep. at 221].   Overman and Therault both reported to Rogiers. [Wright Dep. at 222]. Overman and Therault's job experience in the midrange environment was roughly equivalent to Wright's experience. [Wright Dep. at 222-223].

31. Both Overman and Therault were younger than Wright.   [Wright Dep. at 224; Wright Declaration ¶ 20].

32. Overman had eleven (11) tickets pulled and was never disciplined. [**Plaintiff's Exhibit E - Release Pull Reports**; Defendant's Interrogatory Response No. 12].   Therault had three (3) releases pulled and was never disciplined. [Release Pull Reports; Defendant's Interrogatory Response No. 12].

## III.   ARGUMENT

### A.   STANDARD ON SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that "summary judgment shall only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."   Fed.R.Civ.P. (56)(c).  The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the non-moving party's case. *Roe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994).   To withstand a motion for summary judgment, non-movant need not match witness for

witness, nor persuade the court that non-movant's case is convincing; non-movant must only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). The record and all reasonable inferences that may be drawn from it are viewed in a light most favorable to the party opposing the motion. *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 234 (7th Cir. 1995) *cert. denied,* 115 S.Ct. 2249 (1995).

In an employment discrimination case, an employee can survive a motion for summary judgment on the issue of pretext if he or she produces evidence that calls into question the employer's proffered reasons for dismissal. *O'Connor v. Depaul University*, 123 F.3d 665, 670 (7th Cir. 1997). "If the employee succeeds in casting doubt on the proffered reasons for [the adverse employment action], the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider." *Id.* Moreover, summary judgment is particularly inappropriate for settling issues of intent or motivation, *see Connor v. Reinhard*, 847 F.2d 384, 393-394, 396-397 (7th Cir.), *cert denied*, 488 U.S. 856 (1988), particularly where, as here, the claims are brought under a statute that allows for trial by jury. *Vissar v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 660 (7th Cir. 1991)(en banc).

### B. WRIGHT'S AGE DISCRIMINATION CLAIM

### 1. Applicable Standard

The Age Discrimination in Employment Act makes it unlawful for an employer to discharge an individual because of his age. 29 U.S.C. § 623(a)(1). "A plaintiff can prove discrimination under the ADEA by presenting direct or circumstantial evidence that an employer took an adverse job action against him because of his age." *Grimm, ET AL., v. Alro Steel Company*, 410, F. 3d 383, 385 (7th Circ. 2005).   In the alternative, a Plaintiff may establish a *prima facie* case of age discrimination under the indirect method by showing: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly-situated person outside the protected class more favorably. See, e.g., *Faas v Sears, Roebuck & Co.*, 532 F.3d 633, 641-642 (7th Cir. 2008) (citations omitted).  "Under either method, summary judgment is improper if the plaintiff offers evidence from which an inference of discrimination may be drawn." *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999).  Wright proceeds under the indirect method.

The Seventh Circuit has recognized that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Johnson v. Artim Transportation System, Inc.*, 826 F.2d 538, 542 (7th Cir. 1987) *quoting Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).   Indeed, the Seventh Circuit recently confirmed that "the *prima facie* case method established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) was 'never intended to be rigid, mechanized, or ritualistic.'" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405-406 (7th Cir. 2007). "The plaintiff 's evidence on the *prima facie* case need not be overwhelming or even

destined to prevail; rather, the plaintiff need present only 'some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion.'" *Id.* citing *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000).

### 2. Wright's Indirect Evidence Argument

In general, to establish a *prima facie* case of age discrimination, an ADEA plaintiff, such as Wright, must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly situated person outside the protected class more favorably. See, e.g., *Faas v Sears, Roebuck & Co.,* 532 F.3d 633, 641-642 (7th Cir. 2008) (citations omitted).

Liberty Mutual does not challenge the first and third elements of Wright's *prima facie* case. [Def. Brief at 9] Thus, there is no dispute that Wright is a member of a protected class, i.e. he is over the age of forty (40) and that he suffered an adverse employment action, i.e. he was terminated on December 19, 2009. Liberty Mutual argues that Wright cannot establish that he was meeting Liberty Mutual's legitimate work expectations and that similarly-situated employees who were not of the protected class were not treated more favorably. [Def. Brief at 18] Liberty Mutual is wrong. As discussed below, under the facts of this case, Wright establishes his *prima facie* case of age discrimination.

### a.  Plaintiff was meeting Liberty Mutual's Expectations

Liberty Mutual argues that Wright cannot establish that he met its legitimate performance expectations because of his own admissions and because of documented performance reviews [Def. Brief at 18-20]. Liberty Mutual relies upon this same reason as its "legitimate, nondiscriminatory reason" for terminating Wright. [Def. Brief at 11-13] The Seventh Circuit has held that when this prong of the prima facie case and the issue of pretext focus on the same circumstances, they should be "scrutinized with respect to the matter of pretext." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001). In *Vanasco v. National-Louis University*, 137 F.3d 962 (7th Cir. 1998), the Seventh Circuit stated:

> [W]e have previously noted that "in many employment discrimination cases, the second element of the prima facie case, satisfactory job performance, and the issue of pretext focus on the same circumstances because the employer maintains that the discharge was based on its reasonable belief that the employer was not performing in an acceptable manner." *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir.1996). Thus, although we recognize that the prima facie case is technically the first step in the burden shifting method, "we shall eschew a mechanistic application of *McDonnell Douglas* in this circumstance," *Fuka*, 82 F.3d 1397, 1404 (7th Cir. 1996), and proceed to consider whether Mrs. Vanasco met her burden of showing pretext.

Id. at 966.

Here, with respect to whether Wright was meeting Liberty Mutual's legitimate performance expectations as Senior Software Developer, the Court should consider the second prong of the prima facie case in tandem with Wright's evidence of pretext.

       **b.**    ***Will Overman and Matt Therault are similarly situated to Wright***

Liberty Mutual contends that there were no similarly situated employees who were treated more favorably than Plaintiff. [Def's Brief at 20].   However, employees Will Overman and Matt Therault were similarly situated.  The similarly situated requirement "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards and had engaged in similar conduct without such differentiating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F. 3d 612, 617-618 (7th Cir. 2000).  However, this requirement "should not be applied mechanically or inflexibly." *Humphries v. CBOS West, Inc.*, 474 F. 3d 387, 404 (7th 2007) citing *Hull v. Stoughton Trailers, LLC*, 445 F. 3d 949, 952 (7th Cir. 2006).  The inquiry as to whether two employees are "similarly situated" is one of common sense that depends upon the employment context.  *Filar v. Bd. Of Educ.*, 526 F.3d 1054, 1061 (7th Cir. 2008).  Wright need not "present a doppelganger who differs only by having remained in the employer's good graces." *Id.*  The proper inquiry simply "asks if there are sufficient commonalities on the key variables between [Wright] and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination. *Id.*

In this matter, common sense dictates that Wright, Overman and Therault are similarly situated.  Overman and Therault both reported to the same supervisor as Wright – Dina Rogiers.  [Wright Dep. at 222].  Both were members of the DMS team and both had a similar level of experience and background in the Java

24

midrange area.   Like Wright, Overman and Therault were also software developers.  As such, there are sufficient commonalities between Wright, Overman, and Therault on the key variables to allow for a meaningful comparison to be made.

Wright can also point to evidence that Overman and Therault were treated more favorably than he was.   Wright was terminated for having tickets pulled. [Wright Dep. at 124].  Overman had eleven (11) tickets pulled, but he was never disciplined. [Release Pulls Reports; Defendant's Interrogatory Response No. 12]. Similarly, Therault had three (3) tickets pulled, and he was never disciplined. [Release Pulls Reports; Defendant's Interrogatory Response No. 12].  In fact, the only other individual who was disciplined for having releases pulled was David Meyer, who is also over forty (40) years old.  From this, a jury could infer that Defendant treated younger, similarly situated individuals better than Wright.  A question of fact exists as to whether, by not being disciplined for having releases pulled, Wright's younger, similarly situated coworkers were treated more favorably than him.  As such, summary judgment is inappropriate in this case.

### c.  *Liberty Mutual's Reason for Terminating Wright is Pretext*

Once Wright establishes the elements of a *prima facie* case, the burden shifts to Liberty Mutual to come forward with a legitimate, non-invidious reason for its adverse action.  *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 377-78 (7th Cir. 1995).  Once the Defendant presents a legitimate, non-discriminatory reason for the adverse action, the burden shifts back to Wright to show that the proffered reason is pretextual. *Id.*  An employee may establish pretext by producing evidence

that may indicate to a jury that the employer's proffered reason is not the actual reason for the adverse employment action. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006). "[I]f the stated reason, even if actually present to the mind of the employer, wasn't what induced him to take the challenged employment action, it was a pretext." *Forrester* at 418. Here, the evidence demonstrates that to the extent Liberty Mutual has articulated a legitimate nondiscriminatory reason for terminating Wright, it was not the actual reason for Liberty Mutual's decision to terminate Wright.

### i. Wright was disciplined and terminated for conduct that was beyond his control.

Defendant argues that Wright was terminated because of ongoing and well-documented performance problems centered on timely completion of projects. [Def's Brief at 23]. However, when Wright did struggle with a project, almost exclusively, his timeliness issues were caused by extenuating circumstances that the Defendant refused to consider. [Wright Dep. at 124]. When Wright transferred to the DMS team, he did so and was hired on the basis that he would be receiving training in the mid-range environment to complement his mainframe skills. He was upfront with the Defendant about his skill level in the mid-range environment. [Wright Dep. at 189]. Yet, in his first two years on the DMS team, he was continually given mainframe work to complete and was not given the opportunity to expand his mid-range skills. [Wright Declaration ¶ 3-5]. Still, in a desire to keep up with the ever-changing technology, Wright took classes and read manuals, including completing over 200 hours of training. [Wright Dep. at 143; Defendant's Exhibit Tab G]. Then,

when the Defendant finally did assign Wright midrange work, they did so without providing him an adequate mentor.  Essentially, the Defendant tossed Wright into the water without a lifejacket and set him up to fail.

Then, with many projects he was given in 2008-2009, extenuating circumstances arose that kept Wright from meeting his deadlines.  For example, in 2009, Wright was assigned to develop logging for Ticket 7261.  Wright was directed to make a change because Lam Nguyen's first design was not favorable. [Wright Declaration ¶ 11].  This design was changed again and again.  By September 2009, there had been five design changes.  [Id.] In September 2009, Wright invited Dina Rogiers to attend a meeting where the multiple logging designs were discussed so that she could see first-hand the discussion of the tried-and-rejected designs and how a missed deadline in this case was not Wright's fault. [Id.] Rogiers attended the meeting and witnessed the discussion and review of the various design efforts proposed by Nguyen and Schultz, but she still rejected Wright's explanation.  [Id.] Additionally, others who were involved in the troubles of these projects were never disciplined for untimely completion. [Defendant's Interrogatory Response No. 12].

Additionally, Wright was unable to complete some of his assignments because of misdirection by Shad Schultz and Lam Nguyen, software developers who were younger than him.  In late November 2009, while on probation, Wright ran into testing problems for the December release of the Blank ID Card Ticket (CQ 7479).  [Wright Declaration ¶ 16].  Wright was unable to adequately test changes because of a web certificate problem.  [Id.]   Wright emailed Shad Schultz on

November 20, who offered to help Wright, but instead, Schultz went on vacation without informing Wright, who had to turn elsewhere.  Wright sought assistance from other employees, and learned from Curt Gleim and Nguyen that many, including Schultz and Nguyen, had struggled with the issue and gave up on it. [Id.] Wright's ticket was pulled for this project.  [Defendant's Exhibit Tab N].  However, Schultz and Nguyen were not disciplined for his role in this project's failure to be timely released.  [Defendant's Interrogatory Response No. 12].

In another project, CQ 7836, the Services 2 web services schema changes, Shad Schultz had written the ticket instructions poorly. [Wright Declaration ¶ 18.] Despite his ticket's directions, Schultz only needed two webservices changed instead of all eleven, which caused Wright to spend a tremendous amount of time working and reworking the project.  Regardless, Schultz and Nguyen still had the ticket pulled, and Wright completed only half the work by the release date.  [Id.] Schultz, a younger Sr. Software Developer, was not disciplined for his role in this project. [Defendant's Interrogatory Response No. 12].

The failure of Liberty Mutual to take into account the extenuating, mitigating circumstances and misdirection by Schultz and Nguyen in Wright's performance is evidence that Liberty Mutual's purported reason for terminating Wright is pretext and creates an issue of material fact.

     ii.    ***The more favorable treatment extended to Overman and Therault is also evidence of pretext.***

The Seventh Circuit has found that "[a] showing that similarly situated employees belonging to a different [protected] group received more favorable

treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for . . . discrimination." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001).

As described above, Overman and Therault are similarly-situated younger employees who received more favorable treatment than Wright. Because there is evidence from which a jury could find that Liberty Mutual's reason for terminating Wright was pretext for discrimination, the Defendant's Motion for Summary Judgment must be denied.

## III.   CONCLUSION

Wright has presented sufficient evidence and pertinent legal authorities to demonstrate that there are genuine issues of material fact that preclude the grant of summary judgment on his age discrimination claim.  For the foregoing reasons, Wright respectfully requests that Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

s/ Andrew Dutkanych
Andrew Dutkanych (#23551-49)
BIESECKER DUTKANYCH & MACER, LLC
411 Main Street
Evansville, IN 47708
Telephone:  (812) 424-1000
Facsimile:  (812) 424-1005
Email: ad@bdlegal.com

*Attorney for Plaintiff Jerry Wright*

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2012, a copy of the foregoing *Plaintiff's Response In Opposition to Defendant's Motion for Summary Judgment* was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.

For Defendant:

Jackson Lewis LLP
Michael W. Padgett: padgettm@jacksonlewis.com


<u>s/ Andrew Dutkanych</u>
Andrew Dutkanych