UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JERRY WRIGHT,<br>Plaintiff,<br><br>vs.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:10-cv-1626-RLY-TAB |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On December 15, 2010, Jerry Wright ("Plaintiff") filed a complaint against his former employer, Liberty Mutual Insurance Company ("Defendant"), alleging that he was terminated because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* On February 10, 2012, Defendant filed the instant motion for summary judgment. Based on the reasons set forth below, Defendant's motion is **GRANTED**.

## I. Factual Background

### A. Plaintiff's Employment History

On October 11, 2004, Defendant hired Plaintiff as a Senior Software Developer in Defendant's Informational Systems Department. (Declaration of Karen Lobbregt ("Lobbregt Dec.") ¶ 6; Deposition of Plaintiff ("Plaintiff Dep.") at 89). At the time he was hired, Plaintiff was 46 years old, and had 21 years of programing experience.

(Plaintiff Dep. at 81; Lobbregt Dec. ¶ 7).

The Senior Software Developer is categorized as a Grade 16 position, and involves designing and coding complex software systems under limited supervision. (*See* Senior Software Developer Job Description). As noted in the job description, the position requires a Bachelor's or Master's Degree in a technical or business discipline and at least five years of professional experience. (*Id.*; Declaration of Dina Rogiers ("Rogiers Dec.") ¶ 11). Plaintiff's role on the document management system ("DMS") team required programming skills in both mid-range and mainframe programming.[1] (Senior Software Developer Job Description; Rogiers Dec. ¶ 8).

Plaintiff was originally hired to work on the claims team, and primarily managed the technological issues involved in processing insurance claims. (Plaintiff's Dep. at 89). In 2006, Plaintiff applied to be transferred to the DMS team in order to gain more experience working with mid-range programming. (*Id.* at 88-90, 189). During his interview for the DMS team position, Plaintiff informed the DMS team manager, Martin Van Tiem ("Van Tiem"), that his mid-range programming skills were not as proficient as his mainframe programming capabilities. (*Id.* at 189). Nevertheless, in May 2006, Van Tiem hired Plaintiff on the DMS team. (*Id.* at 89-90).

---

[1]"Mid-range" programming involves the computer programming language known as JavaScript, whereas "mainframe" programming involves the computer programming language known as COBOL. (Rogiers Dec. ¶ 8).

**B. Plaintiff's Performance Issues**

After Plaintiff transferred to the DMS team, his supervisors, Van Tiem and Gene James ("James"), began noticing issues with Plaintiff's work performance. (*See* 2006 Performance Review). In Plaintiff's 2006 Performance Review, Van Tiem noted that Plaintiff lacked "consistent and open communication" with other DMS team members as well as his supervisors, and that Plaintiff needed to improve his knowledge of the DMS systems. (*Id.* at 8). In Plaintiff's 2007 Performance Review, Van Tiem and James both noted that Plaintiff was regressing in his communication skills with team members and management. Van Tiem specifically stated that Plaintiff's communication shortcomings did "not fit well within his current Senior role where technical and personal mentoring and peer leadership is expected." (2007 Performance Review at 6). James noted that Plaintiff needed to "come up to speed" on his mid-range programming skills, a fact Plaintiff acknowledged. (*Id*. at 5-6). In addition, on multiple occasions, James informed Plaintiff that he needed to complete projects on a more timely basis. (Plaintiff Dep. at 151).

In Plaintiff's 2008 Performance Review, James noted that Plaintiff still struggled with time management issues. "[Plaintiff] works a lot of hours but still seems to miss deadlines within a highly focused role." (2008 Performance Review at 9). James also noted that Plaintiff still struggled with his communication skills and mid-range programming skills. (*Id*. at 9-10). Finally, James noted that Plaintiff refused to work with one member of the DMS team, even after he told Plaintiff that not working with that

team member was unacceptable. (*Id.*; Plaintiff's Dep. at 159).

On January 1, 2009, Dina Rogiers ("Rogiers") became the DMS team manager. (Rogiers Dec. ¶ 7). Shortly thereafter, Rogiers discovered that Plaintiff failed to properly manage a project assigned to him – the VIS WAS 6.1 upgrade. (*Id.* ¶ 32). Plaintiff was named as the primary lead on the project in August 2008, but because of missed deadlines, the project was stalled in the developmental stage as of December 2008 due, in part, to Plaintiff's refusal to work with a co-worker. (*Id.* ¶ 33). Rogiers assigned another Senior Software Developer to the project, who resolved the issue in two business days. (*Id.* ¶ 34). Plaintiff conceded that he did not meet Defendant's objective with respect to completion of the upgrade, claiming that the assignment was beyond his mid-range skill set. (Plaintiff Dep. at 177; 185).

On March 31, 2009, Rogiers assigned Plaintiff the primary lead on the Go America Retirement project. (Rogiers Dec. ¶ 35). The Go America Retirement project was expected to be completed and released on June 13, 2009. (*Id.* ¶ 37). On May 26, 2009, Plaintiff told Rogiers that he had "done nothing on the project," other than administrative work. (*Id.*). Therefore, Rogiers issued Plaintiff a verbal warning for failure to timely identify problems and meet deadlines. (*Id.* ¶¶ 37-38). On June 12, 2009, one day before the release date, Plaintiff informed Rogiers that the Go America Retirement project lacked a verifiable audit trail based on a programming issue (the "balancing issue"). (*Id.* ¶ 39; Plaintiff Dep. at 194-95). Plaintiff actually discovered the balancing issue two weeks prior to informing Rogiers about it, but waited to disclose the

issue to her because another Senior Software Developer, who Plaintiff believed to be working on the balancing issue, was on vacation at the time Plaintiff discovered the error. (Plaintiff Dep. at 195-96).

**1. Written Warning**

On June 24, 2009, Rogiers issued Plaintiff a written warning for his poor work performance with respect to the VIS WAS 6.1 upgrade and the Go America Retirement project. (Rogiers Dec. ¶ 43). Rogiers noted specific areas where Plaintiff needed to improve his work performance, which included performing tasks within the designated time period, communicating with managers, and collaborating with co-workers. (*Id.* ¶ 44; Written Warning at 3). The written warning provided that Plaintiff had 45 days to improve his performance in the areas outlined by Rogiers, or further disciplinary action would be taken against him. (Written Warning at 3). To assist Plaintiff in improving his work performance, the written warning directed Plaintiff to attend weekly meetings with Rogiers to discuss Plaintiff's progress. (*Id.*).

Plaintiff disagreed with the assessment of his work performance outlined in the written warning. (*Id.* at 3-4). Plaintiff handwrote a statement on the warning, claiming that many of his quotes and comments were taken out of context. (*Id.* at 3). In addition, with respect to the circumstances involving the Go America Retirement project and the balancing issue, Plaintiff argued that he should not bear the ultimate responsibility since 12 other DMS team members were also working on the project. (*Id.* at 4).

**2. 2009 Mid-Year Performance Review**

In August 2009, Rogiers prepared Plaintiff's mid-year performance review. (Rogiers Dec. ¶ 29). As was noted in performance reviews from the previous two years, Rogiers found issues with Plaintiff's ability to timely complete projects and communicate with his managers. (2009 Mid-Year Performance Review at 13). Additionally, Rogiers stated that Plaintiff should "take more ownership and interest in his job," and pointed out three specific projects where Plaintiff failed to meet the objectives that were required of him – ClearQuest Ticket 7261 ("Ticket 7261"), ClearQuest Ticket 6864 ("Ticket 6864"), and ClearQuest Ticket 7128 ("Ticket 7128"). (*Id.* at 2-5). Ticket 7261 was scheduled to take 40 hours to complete; however, Plaintiff logged 106 hours on the project, without informing his supervisor, and still did not complete the project. (*Id.* at 4-5). With respect to Ticket 6864, Plaintiff finished his coding work on the project, but forgot to inform the testers that his work was completed, thereby causing delay in the release date of the project. (*Id.* at 168; 2009 Mid-Year Performance Review at 3, 5). With respect to Ticket 7128, Plaintiff completed his work on the project, but refused to give his work to the tester because Plaintiff did not trust him. (2009 Mid-Year Performance Review at 3). Plaintiff's refusal caused unnecessary delay in the release of the ticket. (*Id*; Plaintiff Dep. at 169).

Plaintiff added the annotation "DNM," which stood for "did not meet," on many comments made by Rogiers on his mid-year review, indicating his agreement with Rogiers's assessment of his performance. (2009 Mid-Year Performance Review).

Specifically, Plaintiff wrote "DNM" in relation to Ticket 7261, Ticket 6864, and Ticket 7128. (*Id.* at 2-5). Plaintiff claims that by writing "DNM" on Rogiers's notes, he did not necessarily believe that he did not meet the project's objectives; rather, that he was trying to "avoid confrontation and argument." (Plaintiff Dep. at 164).

**3. 45-day Probation**

On August 26, 2009, Rogiers placed Plaintiff on a 45-day probation because his work performance had not improved since he received the June 2009 written warning. (Rogiers Dec. ¶ 47; Probation Memo at 1). As examples of Plaintiff's poor work performance, Rogiers specifically referenced Ticket 7261, Ticket 6864, and Ticket 7128. (Probation Memo at 1-2). Rogiers provided Plaintiff with a list of specific areas where Plaintiff needed to improve, and, toward that end, held weekly meetings with Plaintiff. (*Id.* at 2-3). Like he did on the written warning, Plaintiff handwrote a statement on the probation memo indicating that he disagreed with Rogiers's assessment of his performance. (*Id.*).

On September 29, 2009, Plaintiff contacted Defendant's Office of Corporate Compliance regarding Rogiers's decision to discipline Plaintiff based on his performance on the Go America Retirement project. (Declaration of Martha Kaubris ("Kaubris Dec.") ¶ 5). John Heveran ("Heveran"), Defendant's Senior Vice President of Corporate Information Systems, reviewed Rogiers's disciplinary measures taken against Plaintiff. (*Id.* ¶ 6). At the end of October 2009, Heveran agreed that Plaintiff's performance problems were significant. (*Id.*).

On November 13, 2009, Rogiers issued a memorandum, extending Plaintiff's probationary period for an additional 30 days due to the stay on Plaintiff's progressive discipline resulting from his complaint to the Office of Corporate Compliance. (Rogiers Dec. ¶¶ 54-55). In the memorandum, Rogiers noted two additional incidents where Plaintiff failed to meet the project's objectives – ClearQuest Ticket 6920 ("Ticket 6920") and ClearQuest Ticket 7477 ("Ticket 7477"). (30-Day Probation Extension at 1). With respect to Ticket 6920, Rogiers claimed that Plaintiff caused an error that made the testing system crash. (*Id.*). Plaintiff conceded that he was working in the testing system that crashed, but that there was no way to determine who caused the error since other developers were also working with that testing system. (Plaintiff Dep. at 210). With respect to Ticket 7477, Rogiers claimed that Plaintiff struggled with the assignment, and did not meet the deadline. (30-Day Probation Extension at 1).

**C. Termination**

On December 14, 2009, at the conclusion of his probationary period, Rogiers terminated Plaintiff based on his continued failure to meet Defendant's expectations. (Rogiers Dec. ¶ 62; Termination Notice). Rogiers followed Defendant's discipline and involuntary termination policy in disciplining, and ultimately terminating, Plaintiff. (*See* Discipline and Involuntary Termination Policy). Neither during the instances where Plaintiff was being disciplined, nor when he was terminated, did Plaintiff complain of age discrimination. (Rogiers Dec. ¶¶ 46, 53, 56, 63). All other facts necessary to the resolution of this motion are contained later in this Entry.

## II. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party, however, may not rest upon the mere allegations or denials in its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248. In deciding whether genuine issues of material fact exist, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

## III. Discussion

Under the ADEA, it is illegal for an employer "to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such an individual's age." 29 U.S.C. § 623(a)(1). "To establish a violation of the ADEA, an employee must show that age actually motivated the adverse employment action." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 663, 641 (7th Cir. 2008). A plaintiff may set forth a claim under the ADEA through either the direct method or the indirect method. *Van Antwerp v. City of Peoria, Ill.*, 627

F.3d 295, 297 (7th Cir. 2010) (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006)).

Plaintiff proceeds under the indirect method of proof, which requires him to show that: "(1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of the protected class or were substantially younger were treated more favorably." *Tubergen v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 517 F.3d 470, 475 (7th Cir. 2008) (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001)). "[T]he plaintiff's evidence on the prima facie case need not be overwhelming or even destined to prevail; rather, the plaintiff need present only 'some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion.'" *Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir. 2000) (quoting *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir. 1997)).

If Plaintiff establishes a *prima facie* case of discrimination, the burden shifts to Defendant, who must produce a "legitimate, nondiscriminatory reason for the adverse employment decision." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (citing *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002)). If Defendant proffers such a reason, then Plaintiff bears the ultimate burden of showing that the proffered reason is pretext for discrimination. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973)).

The parties do not dispute that the first and third prong of the *prima facie* case are met: Plaintiff is over the age of forty (40), and he was terminated by Defendant. Therefore, the court limits its analysis to whether Plaintiff was meeting Defendant's legitimate expectations, and if similarly situated younger employees received more favorable treatment.

**A. Legitimate Expectations**

Generally, when determining "whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance, but 'whether the employee was performing well at the time of his termination.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (quoting *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991)). Previous employment history may also be "'relevant and probative in assessing performance at the time of [the employment action], [but] its limited utility must also be recognized.'" *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 901 (7th Cir. 2005) (quoting *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998)).

From the time he was transferred to the DMS team in 2006 to his termination in December 2009, Plaintiff continuously failed to meet Defendant's performance expectations. (*See, e.g.*, 2006-2009 Performance Reviews). Moreover, in the six months preceding his termination, Plaintiff was placed on Defendant's progressive discipline track, beginning with a written warning in June 2009. Plaintiff recognized his poor

performance by writing "DNM" next to many of the criticisms noted by Rogiers in his 2009 Mid-Year Performance Review, including his performance with respect to Ticket 7261, Ticket 6864, and Ticket 7128. (2009 Mid-Year Performance Review). Although Plaintiff tried to downplay the significance of the "DNM" notations, Plaintiff admitted that he did not achieve the projects' objectives with respect to those Tickets. (*See id.* at 164, 166-77).

By August 2009, Plaintiff's work performance had not improved, and he was placed on a 45-day probation. Defendant took great strides to help Plaintiff improve his performance, including, *inter alia*, weekly coaching sessions with Rogiers. The record shows that Defendant was forthcoming with Plaintiff about his poor performance, and offered Plaintiff multiple opportunities to improve his performance. Despite such efforts, Plaintiff failed to show any improvement. Therefore, Plaintiff fails to show that he was meeting Defendant's legitimate expectations at the time of his termination.

**B. Similarly Situated Employees**

Employees are similarly situated if they are "directly comparable to h[im] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). The similarly situated inquiry is "a flexible one that

considers 'all relevant factors, the number of which depends on the context of the case.'" *Humphries v. CBOS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Radue*, 219 F.3d at 617). A plaintiff need not show complete identity with a proposed comparator, but she must show "'substantial similarity.'" *Id*. (quoting *Radue*, 219 F.3d at 618).

Plaintiff argues that two younger employees – Matt Therault ("Therault") and Will Overman ("Overman") – were similarly situated to him. Therault and Overman did not hold the same grade level position, nor have the same level of work experience, as Plaintiff. Therault and Overman were recent college graduates when they were hired by Defendant into entry-level positions. At the time of Plaintiff's termination, Therault was a Grade 13 Associate Systems Administrator, and Overman was a Grade 14 Software Developer. By contrast, Plaintiff had 21 years of experience prior to his employment with Defendant. (*See* Plaintiff Dep. at 81). At the time he was terminated, Plaintiff was working as a Grade 16 Senior Software Developer, an advanced-level programming position.

In addition, Therault and Overman did not have comparable programming skills to Plaintiff. (*See* Rogiers Dec. ¶¶ 77-78) (noting that Therault and Overman "had not been trained in [mid-range programming], [were] not certified at any level as trained in [mid-range], and had not worked in [mid-range] at any time"). Therault's and Overman's positions only required them to perform low to medium complexity programming under general supervision, while Plaintiff's position required him to perform complex programming under limited supervision. Although Plaintiff, Therault and Overman were

members of the same programming team, that fact alone is insufficient to find substantial similarity among them. *See Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) (noting suitable comparators must have similar roles and performance histories) (citing *Filar v. Bd. of Educ. of Chi.*, 526 F.3d 1056, 1061 (7th Cir. 2008)).

Lastly, Plaintiff argues he was terminated for failing to timely complete projects, but Therault and Overman were not. Rogiers testified that there are a number of reasons why an employee may be late in completing a project, many of which are not the fault of the employee. (*See* Rogiers's Dec. ¶ 18) (stating that a project may be released late for reasons other than an employee's poor job performance, such as instances where "another team completing a different portion of a project may affect the project completion date[,] or the team responsible for testing the completed project may be delayed in testing"). Thus, simply asserting that Therault and Overman failed to complete projects, without further context, is insufficient to show substantial similarity. Because Plaintiff fails to show that Therault and Overman were substantially similar in all material respects, he fails to establish a *prima facie* case of age discrimination.

**C. Pretext**

Defendant's proffered reason for terminating Plaintiff was due to his poor work performance. (*See* Termination Notice). To establish pretext, Plaintiff "must show that [Defendant] did not honestly believe in the reasons it gave for terminating [him]." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478-79 (7th Cir. 2010) (citing *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 876 (7th Cir. 2002)). Simply arguing that the

employer's decision was mistaken, ill-considered, or based upon erroneous grounds is insufficient. *Id*.

Plaintiff advances two arguments in support of his pretext argument. First he contends that there were extenuating circumstances in some instances that led to his performance failures. Second, he again cites to Defendant's preferential treatment of Therault and Overman. Neither of these arguments establishes that Defendant's stated reason for Plaintiff's termination is unworthy of belief. Plaintiff's first argument is irrelevant to the pretext inquiry, and Plaintiff's second argument is not born out by the facts. Accordingly, Defendant's motion for summary judgment on Plaintiff's age discrimination claim must be **GRANTED**.

## IV. Conclusion

Based on the reasons set forth above, Defendant's motion for summary judgment (Docket # 34) is **GRANTED**.

**SO ORDERED** this 19th day of September 2012.

RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record